In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2059

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADAM JADERANY, a/k/a AHMAD JADERANIPOOR,
a/k/a A.J. JADERANY, a/k/a AHMAD JADERANY,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 97 CR 6--William C. Lee, Chief Judge.


Argued November 8, 1999--Decided July 21, 2000


        Before POSNER, Chief Judge, and RIPPLE and DIANE P.
WOOD, Circuit Judges.

        RIPPLE, Circuit Judge.  Adam Jaderany, a used car
salesperson in Fort Wayne, Indiana, was indicted
for his participation in a scheme to defraud used
car buyers. The scheme involved purchasing used
cars at auction, rolling back their odometers,
altering their titles, and then reselling them.
At trial, the Government provided testimony that
Mr. Jaderany was involved personally in altering
both the odometers and the titles of used cars,
and the jury convicted him on six counts of
transporting stolen goods and securities across
state lines. After his motion for acquittal was
denied, Mr. Jaderany asked the district court to
grant him a downward departure in sentencing
based on his family circumstances and his
community involvement as a successful
businessman. The district court denied the
request for the departure.

        On appeal, Mr. Jaderany submits that the
evidence was insufficient to support his
conviction and that the district court made a
mistake of law when it refused to grant him a
downward departure. We hold that there was
sufficient evidence to support a conviction and
that the district court properly analyzed the
question of whether it should grant a downward
departure. We therefore affirm the judgment of

the district court.

I
BACKGROUND

Because this is an appeal from a conviction, we must construe the facts in the light most favorable to the Government. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Asher, 178 F.3d 486, 488 n.6 (7th Cir. 1999); United States v. Wingate, 128 F.3d 1157, 1158 (7th Cir. 1997). The Government prosecuted Adam Jaderany for his involvement in a scheme to purchase used cars at auction, roll back the odometers, and then re-sell them. He was convicted under 18 U.S.C. sec. 2314 (transporting forged securities) and 2 (aiding and abetting). We summarize briefly the relevant facts.

The scheme to defraud used car buyers originated with several auto dealers in Illinois. The dealers obtained vehicles at auto auctions. After a car was purchased at auction, its odometer was rolled back in order to increase the resale value of the car. The title was then altered to reflect the new lower mileage.

When Illinois stopped processing titles submitted by several of the dealers, they turned to Mr. Jaderany, who obtained false Indiana titles for them. The false titles had the names of people chosen randomly out of the phone book. Mr. Jaderany provided forged power of attorney documents to his employees, allowing them to obtain title in the names of the unaware, randomly selected people. According to witnesses, Mr. Jaderany was involved personally in both tampering with odometers and altering titles. There was also evidence that documents relating to the vehicles were transported across state lines.

Mr. Jaderany was indicted on 21 counts relating to the alleged fraud. The jury convicted him on six of those counts, relating to the fraudulent resale of six vehicles. Mr. Jaderany moved for acquittal, arguing that the evidence was insufficient to support the conviction. The district court denied that motion.

The district court also refused to grant Mr. Jaderany's request for a downward departure based on his family ties and community status. Mr. Jaderany provided extensive evidence that he had important responsibilities to his wife and children and that he was a well-regarded businessman in the community. The district court found that his evidence did not indicate unusual circumstances that would take him outside the "heartland" of family and employment

circumstances cases and that, therefore, a departure was unwarranted.

## II
## DISCUSSION
### A. The Sufficiency of the Evidence
1.

A defendant seeking to overturn a conviction based on the insufficiency of the evidence faces a "heavy burden." United States v. Granados, 142 F.3d 1016, 1019 (7th Cir. 1998); United States v. Agostino, 132 F.3d 1183, 1192 (7th Cir. 1997). We must view all of the facts in the record in the light most favorable to the Government. See Jackson, 443 U.S. at 319; United States v. Curry, 187 F.3d 762, 769 (7th Cir. 1999). Drawing all reasonable inferences favorable to the Government, we must determine whether it has proved the elements of the crime beyond a reasonable doubt. See United States v. Hill, 187 F.3d 698, 700 (7th Cir. 1999); United States v. Masten, 170 F.3d 790, 794 (7th Cir. 1999). Reversal is appropriate only if there is truly no evidence from which the jury reasonably could have convicted the defendant. See Masten, 170 F.3d at 794; Granados, 142 F.3d at 1019.

Mr. Jaderany was convicted of violating 18 U.S.C. sec. 2314, which governs the transportation of stolen goods and securities across state lines. The district court instructed the jury that to convict Mr. Jaderany, the Government was required to prove four elements of the crime: (1) that the defendant transported securities in interstate commerce, or caused them to be transported; (2) that the securities were forged or altered at the time the defendant transported them; (3) that the defendant knew the securities were forged or altered at the time the defendant transported them; and (4) that the defendant acted with unlawful or fraudulent intent. This instruction was a proper statement of the law. See United States v. Yusufu, 63 F.3d 505, 509-10 (7th Cir. 1995); accord United States v. Drew, 722 F.2d 551, 553 & n.1 (9th Cir. 1983) (using a slightly different formulation of the same elements); United States v. Johnson, 718 F.2d 1317, 1323 (5th Cir. 1983) (en banc) (same); United States v. Brown, 605 F.2d 389, 393 (8th Cir. 1979) (same)./1

2.

Mr. Jaderany's argument is based primarily on a perceived analogy between his case and the case of James Rekrut in United States v. Martin, 815 F.2d 818 (1st Cir. 1987). In Martin, co-defendant Rekrut showed that the evidence was insufficient to convict him. See id. at 824-27. In that case,

Rekrut was a salesman for a car dealer who was found to be perpetrating a fraud on consumers. Rekrut argued that there was no evidence showing that he should have known that he was part of a fraudulent scheme. The Government entered no expert testimony demonstrating that actions taken by Rekrut were inconsistent with normal business practices in the used car industry. See id. at 826. The First Circuit held that Rekrut's conviction could not stand, because the Government had not foreclosed the possibility that a person in Rekrut's position would think he was working for a legitimate business. See id. at 826-27. Mr. Jaderany argues that, as in that case, the Government has not provided evidence of what constituted normal business procedures in the sale of used cars, to compare with Mr. Jaderany's conduct. He also argues that the Government had the obligation to provide such testimony in order to prove that Mr. Jaderany acted with knowledge or intent. Finally, he notes that he was acquitted on most of the counts which, he argues, supports an argument of insufficient evidence.

The Government responds that the evidence missing in Martin--evidence showing that the defendant was "aware of the fraudulent nature" of the documents--is present here. Martin, 815 F.2d at 825. Several witnesses testified at Mr. Jaderany's trial that he had personal knowledge of fraud. Charles Bellavia, an automobile purchasing agent, testified that he personally saw Mr. Jaderany alter a vehicle title and that he was with Mr. Jaderany when they both witnessed a vehicle's odometer being rolled back. Colleen Dunn, an insurance agent and former car salesperson, testified that she spoke to Mr. Jaderany personally and that he obtained new and fraudulent titles for her in exchange for a fee. She also testified that Mr. Jaderany said he would choose names out of the phone book to use on titles. Joseph Sosani, who was convicted for his involvement in the odometer rollbacks, testified that, on one occasion, Mr. Jaderany was present when a title was altered to reflect lower mileage. Robin Lee Younger, the bookkeeper for an automotive repair shop, testified that Mr. Jaderany offered money to have the odometers rolled back on automobiles even though a mechanic told him it was illegal. Frank Loftus, a former employee of Mr. Jaderany's, testified that he saw Mr. Jaderany forge titles.

The Government submits that all of this evidence is sufficient to show that Mr. Jaderany knew the essential purpose of the scheme and intended to further it. Distinguishing Martin, the Government points out that in that case Rekrut was a low-ranking employee in the scheme handling documents

that appeared valid on their face. Here, it argues, Mr. Jaderany was shown to have personally involved himself in altering titles and thus demonstrated a knowledge that Rekrut lacked. Furthermore, it contends, expert testimony is unnecessary to show that Mr. Jaderany's practices were not accepted in the industry. The Government also notes that, although Mr. Jaderany was acquitted on many of the counts, such acquittals do not require acquittal on the six counts of which he was convicted. See United States v. Powell, 469 U.S. 57 (1984).

3.

Our task here is to consider only whether the Government provided sufficient evidence to permit a reasonable jury to find that Mr. Jaderany acted with knowledge and intent. We believe that the Government has met that burden. Several witnesses provided testimony about Mr. Jaderany's personal involvement in altering titles and rolling back odometers. This testimony, once found credible by the jury, was sufficient to show that Mr. Jaderany acted with the requisite knowledge and intent. We shall not question the jury's decision on this credibility issue. See United States v. McGee, 189 F.3d 626, 630 (7th Cir. 1999) ("As we have made clear, it is not our role, when reviewing the sufficiency of the evidence, to second-guess a jury's credibility determinations."); United States v. McCaffrey, 181 F.3d 854, 856 (7th Cir. 1999) ("We will not substitute our own credibility assessment for that of the factfinder . . . ."). Mr. Jaderany's analogy to Martin is unavailing because, unlike in that case, the Government has provided evidence from which a reasonable jury could infer that he personally knew the fraudulent nature of his actions.

Our assessment is not undermined by the jury's decision to convict Mr. Jaderany on some counts but not on others. We conduct our sufficiency of the evidence review "independent of the jury's determination that evidence on another count was insufficient." Powell, 469 U.S. at 67; United States v. Iriarte-Ortega, 113 F.3d 1022, 1024 n.2 (9th Cir. 1997) (quoting Powell); United States v. Reed, 875 F.2d 107, 111 (7th Cir. 1989) (same). The counts charged violations of different statutory sections and related to different vehicles, and the jury reasonably could have found that the evidence supported convictions relating to some vehicles but not others.

B.  The Downward Departure

Having found that the jury verdict was based on

sufficient evidence, we turn to Mr. Jaderany's claim that the district court abused its discretion by not granting him a downward departure based on his family circumstances and employment. We may reverse a district court's decision to refuse a departure when it makes a mistake of law. See United States v. Corry, 206 F.3d 748, 750 (7th Cir. 2000); United States v. Thomas, 181 F.3d 870, 873 (7th Cir. 1999). However, if the district court had a correct legal understanding of the guideline yet still chose not to depart, we lack jurisdiction to review its decision. See United States v. Williams, 202 F.3d 959, 964 (7th Cir. 2000); United States v. Hegge, 196 F.3d 772, 774 (7th Cir. 1999). Mr. Jaderany argues that the district court made a mistake of law when it determined that his specific circumstances did not place him outside the boundary of the guideline's heartland./2 We must determine whether the district court's decision that Mr. Jaderany fell within the heartland of Guidelines cases was a mistake of law or, in contrast, was an exercise of discretion of the type we may not review.

1.

The Supreme Court explained the appropriate standard for appellate review of the district court's decisions about sentencing departures in Koon v. United States, 518 U.S. 81 (1996). In doing so, it adopted the methodology of the Court of Appeals for the First Circuit in United States v. Rivera, 994 F.2d 942 (1st Cir. 1993), an opinion written by then-Chief Judge Breyer. Koon, 518 U.S. at 95. In Koon, the Supreme Court explained that each sentencing guideline applies to a "heartland" of cases, which are the "'set of typical cases embodying the conduct that each guideline describes.'" Id. at 93 (quoting 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b)). The district court should depart from the Guidelines only if some unusual feature of the case takes it out of the heartland: the conduct at issue differs significantly from the norm even though the guideline linguistically applies. See id. at 93-95. There are three kinds of potentially unusual factors: forbidden factors, encouraged factors, and discouraged factors. See id. at 95-96. Forbidden factors, such as race or national origin, see id. at 93, may never be used. See id. at 95-96. An encouraged factor, such as victim provocation, see id. at 94, may be used when the applicable guideline has not already taken the circumstance at issue into account. See id. at 96. A discouraged factor, or an encouraged factor already accounted for by the applicable guideline, should be used as a basis for departure only "if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the

factor is present." Id.

In Koon, the Supreme Court also held that appellate courts should review departure decisions only for an abuse of discretion because, on most issues that might arise in this context, district courts are better suited than appellate courts to decide what kinds of cases fall outside the heartland. See id. at 98-99. Nevertheless, an appellate court must reverse if the district court made a mistake of law. Such a mistake of law constitutes an abuse of discretion. See id. at 100. A district court makes a mistake of law when it relies on a factor that may not be considered in any case, see id., or determines that the court has no authority to depart when in fact it does. See United States v. Farouil, 124 F.3d 838, 845 (7th Cir. 1997). A district court also makes a mistake of law when it misconstrues the language of a guideline and consequently mischaracterizes the boundaries of the heartland created by the guideline. The Court of Appeals for the First Circuit described this situation most graphically in Rivera, the case relied upon so heavily by the Supreme Court in Koon. Then-Chief Judge Breyer wrote:

Plenary review is . . . appropriate where the appellate court, in deciding whether the allegedly special circumstances are of a "kind" that permits departure, will have to perform the "quintessentially legal function" . . . of interpreting a set of words, those of an individual guideline, in light of their intention or purpose, in order to identify the nature of the guideline's "heartland" (to see if the allegedly special circumstance falls within it).

Rivera, 994 F.2d at 951 (citation omitted). See also United States v. Talk, 158 F.3d 1064, 1072 (10th Cir. 1998) (citing Rivera). We also recognized this situation in United States v. Canoy, 38 F.3d 893 (7th Cir. 1994). After deciding that extraordinary family circumstances could be a basis for departure, we turned to our sister courts of appeals for guidance on how to construe the guideline:

Because until today, we have interpreted section 5H1.6 to prohibit all departures based on family considerations, we have not had occasion to consider what separates the usual and ordinary family circumstance from the truly exceptional and extraordinary. The other circuits have developed a significant body of law on this question, however.

Id. at 907 (emphasis added). In characterizing the boundary between the ordinary and the exceptional as the subject of a "body of law," we

recognized that the inquiry into the boundary of a heartland has a legal dimension that it is our responsibility to address. Since Koon, the Fourth and Sixth Circuits have also recognized that discerning the boundary of the heartland involves the development of a case law, the task of the appellate court./3 This limited but important reliance on appellate decisions helps ensure consistency among the district courts with regard to particular sentencing guidelines. Consistency is, of course, an important purpose of the Guidelines. See 28 U.S.C. sec. 991(b)(1)(B); United States v. Unthank, 109 F.3d 1205, 1211 (7th Cir. 1997).

Although appellate case law construing a guideline can shape the contours of its heartland and thereby inform the content of the guideline, Koon makes clear that the district courts have responsibility for assessing whether the circumstances of a particular case fall outside the heartland of a guideline. In performing this task, a district court must not only assess the boundary of the heartland but must also determine on which side of that boundary the facts of a particular case fall. While appellate case law construing the guideline will set certain legal limitations on the district court's construction of the guideline, the second step is clearly a factual issue. In this function, the district courts are, the Supreme Court has reminded us in Koon, in a better position to compare the facts of one case with those of the many others it has adjudicated. See Koon, 581 U.S. at 98. As Koon recognized, the district court has "special competence" on the question of a particular case's "ordinariness" or "unusualness." Id. at 99 (quoting Rivera, 994 F.2d at 951).

2.

Section 5H1.6 of the Sentencing Guidelines states that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. sec.5H1.6. Further, sec.5H1.5 states that "[e]mployment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. sec.5H1.5. Since Koon we have had several occasions to review a district court's decision as to whether to depart based on family circumstances or employment. See United States v. Wright, Nos. 99-1684, 99-3642 & 99-3767, 2000 WL 900185 (7th Cir. July 7, 2000); United States v. Stefonek, 179 F.3d 1030 (7th Cir. 1999); United States v. Guy, 174 F.3d 859 (7th Cir. 1999); United States v. Owens, 145 F.3d 923 (7th Cir. 1998); United States v. Carter, 122 F.3d 469 (7th

Cir. 1997).

In our decisions interpreting sec.5H1.6, we have interpreted the guideline language "not ordinarily relevant" to require a sentencing court to recognize that, when an individual is incarcerated, it is expected that his family life will suffer. See Wright, 2000 WL 900185, at *2; Carter, 122 F.3d at 473; Canoy, 38 F.3d at 907. The Guidelines recognizes that many persons convicted of a criminal offense have family responsibilities, including responsibilities to their children; such responsibilities, standing alone, cannot be considered extraordinary. See Stefonek, 179 F.3d at 1038; Carter, 122 F.3d at 475; Canoy, 38 F.3d at 907. We have recognized that a defendant's ability to rely on a supportive spouse or other relatives to look after his children makes his case for a downward departure less compelling. See Carter, 122 F.3d at 474. Under sec.5H1.6, when the defendant is a single parent, the district court, in the exercise of its discretion, must determine whether the particular circumstances warrant a departure. Compare Canoy, 38 F.3d at 908 (cataloging decisions from other circuits where downward departures for single parents were affirmed) with Carter, 122 F.3d at 474 (noting decisions from other circuits where departures were rejected for single parents).

We also have noted that sec.5H1.5 recognizes that, for most defendants, holding a steady job is not extraordinary, but in fact expected. See Carter, 122 F.3d at 475. We have cautioned that the Guidelines do not permit district courts to grant "'middle class' sentencing discounts," because "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." Stefonek, 179 F.3d at 1038. The fact that a defendant's employment was "strikingly meritorious" does not require district courts to grant downward departures on this basis. See Carter, 122 F.3d at 475.

3.

In light of our precedents delineating the boundary of the heartland for family circumstances and employment, we lack jurisdiction to review the district court's decision not to grant a downward departure. The district court correctly recognized that it had the authority to depart based on family and employment circumstances. Although the district court thought that the sentence mandated by the Guidelines was too harsh, and that Mr. Jaderany's

family circumstances were deeply sympathetic, it nonetheless concluded that, because Mr. Jaderany's situation was similar to previous situations in which downward departures were denied, a downward departure was unwarranted in this case.

The district court employed the proper methodology. First, the district court took note of the boundary of the heartland, and in doing so was mindful of other cases that have delineated the parameters of the heartland. Then, it considered the particular facts of Mr. Jaderany's case, and decided that they fell within the heartland as defined by those earlier cases. The factors considered by the district court were Mr. Jaderany's strong family ties, the high regard in which he was held by his community, and his successful business. It then concluded that those factors on their own did not make Mr. Jaderany's case unusual.

We are convinced that the district court correctly understood that it had the authority to depart and correctly perceived the boundaries of the heartland as defined by our earlier cases. Because the district court had a correct understanding of the legal standards for departure, we lack jurisdiction to second-guess the district court's decision not to depart. See Guy, 174 F.3d at 861; Carter, 122 F.3d at 475.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

/1 The counts of which Mr. Jaderany was found guilty (Counts 16-21) also charged him as an aider and abettor. See 18 U.S.C. sec. 2. In order to convict Mr. Jaderany as an aider and abettor, the Government had to prove three things: (1) that he knew of the illegal activity; (2) that he desired to help that activity succeed; and (3) that he took some action to help the scheme succeed. See United States v. Irwin, 149 F.3d 565, 569-70 (7th Cir. 1998); United States v. Woods, 148 F.3d 843, 849-50 (7th Cir. 1998). We have held that "[a]n aider and abettor may be punished with the same severity as a principal." United States v. Coleman, 179 F.3d 1056, 1061 (7th Cir. 1999) (quoting United States v. Corral-Ibarra, 25 F.3d 430, 436 (7th Cir. 1994)). Mr. Jaderany's brief on appeal casts his argument only in terms of the substantive offense under 18 U.S.C. sec. 2314. Yet, it should be noted, his specific contention-

-that he acted without knowledge and intent--is relevant to the aiding and abetting charge as well.

/2 Mr. Jaderany entered evidence of his important role in supporting his wife and children, and of his role as a leader in his community.

/3 See United States v. DeBeir, 186 F.3d 561, 573 (4th Cir. 1999) (comparing facts to those "found exceptional in existing case law"); United States v. Ford, 184 F.3d 566, 585 (6th Cir. 1999) (describing as an issue of law a district court's conclusion that transactions in gambling proceeds were not per se outside a heartland's boundary).